Our next case for argument this morning is Reed v. Columbia St. Mary's Hospital. Mr. Cooper, Mr. Cooper, I thought captains' cases and huge stacks of papers had been replaced by iPads long ago. I guess I'm old school, Your Honor. Only for Judge Easterbrook, not for me. Captains' cases are no longer used even by airplane captains. I thought it made me look older. All right, Mr. Cooper. May it please the Court. I'm Will Cooper, and I represent the Plaintiff Appellant, Linda Reed. Ms. Reed has disabilities including tardive dyskinesia, which impairs her ability to speak. The defendant, Appley Hospital, arbitrarily denied Ms. Reed use of the device that acts as her voice, which is unable to speak. And then roughly through her inseclusion. I'd like to discuss three errors in the summary judgment below. First, the district court should not have dismissed Could I ask you a question before you begin, please? Our standard review on the waiver decision is abuse of discretion. Would it still be an abuse of discretion if the plaintiffs were allowed to reopen discovery on remand on the issue of the affirmative defense? Well, Your Honor, that would certainly be an option. I think the more appropriate course, given the hospital's complete lack of justification for not timely raising the defense, would be to hold the defense waived or forfeited for the case and to remand for trial. And the reason for that is that Ms. Reed has already gone through almost a year of discovery, and she planned for that discovery on the basis of the party's pleadings, as the federal rules require. And if the court were to reopen discovery on remand, I don't think it would be, for example, just a simple matter of reopening one deposition. Ms. Reed would have to take fairly wide-ranging discovery to fairly rebut the defense on not just the relationship between the hospital and the church and the Ascension Entities on paper, but how it functions in reality. I think she would need discovery on the hospital's funding and the financial relationships with the church and the Ascension Entities, any role that the church or another entity in the chain plays with regard to hiring, setting policies and new initiatives, things of that matter that go to the operations of the hospital and also communications between the hospital and the church or the Ascension Entities. It sounds like you want a 10- or 20-factor test for control. Well, no, Your Honor. I believe, actually, that the most straightforward test and the one that has the most support is relatively simple. That would be the extension of the Title IX guidance that both of the Congressional Committee reports point to and that the Department of Justice has applied in the past. And under that test, it's actually relatively simple. An organization is controlled by a religious organization if there are essentially two categories. First, the religious influence is so pervasive that it appears in day-to-day matters such as a religious test for whom the hospital hires. Okay, pervasive influence. Let me just tell you where I'm coming from on this. The statutory verb is controlled. It's not influenced. It's not affiliated with. It's not sponsored by. It's controlled. Why shouldn't we approach that, as lawyers do, in a fairly formalistic way and ask who has the power to appoint and remove board members and or CEOs for Columbia-St. Mary's? Your Honor, control can mean different things in different contexts. Control is different, for example, in veil-piercing context than if you're talking about who's controlling a plane in motion. And, again, the guidance that Congress has pointed to said that an entity is controlled by a religious organization if it espouses religious purpose and the religious entity appoints board members and— Where is this in the statute? Your Honor, the statute just says control. The statute just says control. Okay. But you said something that Congress has pointed to. So Congress does things by statute. That's why I asked about where is this in the statute. Yes, Your Honor, and I am referring to the legislative history, but it's in both committee reports. Legislative history is not the work of Congress. It's the work of particular members of Congress, a subset of the House and Senate. Congress acts by a majority of the House and Senate. I understand that, Your Honor, but this—I'm sorry. I'm sorry. You seem to argue that the defendant has to show control over the day-to-day operations of an organization for the religious exemption to apply. I was wondering what is the basis of that requirement, and I also was wondering if any statute or case required day-to-day control for the exemption to apply. Your Honor, I think the strongest basis for that is that the Department of Justice has issued interpretive regulations on the meaning of the exemption, and there isn't a ton on it, but it does say that the test is whether the religious organization controls the operations of the entity. And I think controlling the operations of the entity— That essentially means management, but that's not what the word control means. A corporate board of directors controls the corporation, even if the CEO manages it. So if you've got, say, a Roman Catholic board of directors, and every member of the board is appointed by the bishop, but the CEO is a Mormon, the Roman Catholic Church still controls that corporation, does it not? Your Honor, I don't think that's necessarily the case. I'd also point out that the FLE thinks that the DOJ's regulation is subject to Chevron deference, thinks that the statute, just the word control, is not clear enough to determine— I don't see how there's any Chevron deference here. The Supreme Court held in Adams' Fruit v. Barrett that when a statute is to be implemented by litigation rather than administrative decision, Chevron does not play a role. This statute is administered by litigation, and under the holding of Adams' Fruit, Chevron is therefore irrelevant. Well, Your Honor, I think under any test, an important factor here is that we don't have a full record here. Ms. Reed had no opportunity to test whether even what's on paper actually is how the relationship between the hospital and the church and the Ascension entities operates on a day-to-day basis. It's also— Can I ask you, you referred, I think, in your briefs to an affiliation agreement. Have I got that term correct? Yes, Your Honor. There's some kind of division of responsibilities between Ascension and the secular parent. Is that right? Yes, Your Honor. Have you seen it? No, Your Honor. We have not. That seems to me a problem. I agree, Your Honor, and that's just one example of the way in which Ms. Reed was entitled to discovery, to probe what everyone here agrees is a fact-intensive defense. Did you request a 30B6 deposition? Was William Fry designated as a 30B6 witness? Because there appears to be some confusion in the record on that point. Your Honor, I wasn't trial counsel, but my understanding is that Mr. Fry was a 30B6 witness as to at least the behavioral health unit. During the deposition, Ms. Reed's trial counsel made a reference to Mr. Fry being a 30B6 witness. The hospital's counsel objected that he hadn't been provided to opine on every policy the hospital had, which I think fairly suggests that he was provided as a corporate witness as to some matters. But independently of the ADA waiver exemption, there is no religious waiver. There is no religious exemption for the Rehabilitation Act, and Ms. Reed's claim for failure to accommodate her disability under the Rehabilitation Act should proceed. If she's relying solely on her speech disorder as her disability, or is she also making a claim about her mental illness as a disability? Your Honor, the accommodation claim is based on her speech disability. And when a hospital that receives federal funds does not accommodate a known speech disability, it excludes that patient from equal participation and equal benefit from medical treatment. And this Court has already held that purposely denying Ms. Reed access to the computer, despite the hospital's knowledge of her disability and its knowledge that she relied on the device, would support a Rehabilitation Act claim. And the record that has developed since that prior opinion shows that Ms. Reed did have a speech disability, relied on the Dynavox device, as the hospital well knew. Yet the hospital had no real policy on accommodating communication disabilities. And in Ms. Reed's case, it made her access to the device subject to appropriate behavior, as if the device were a toy and Ms. Reed a child. The district court's justification for dismissing the claim is... Counsel, this worries me. It seems clear that the hospital made a medical judgment that using access to the Dynavox to achieve a medical end was the right thing to do. And you seem to contend that the ADA overrides a medical judgment. This Court has held otherwise, and it's the uniform law across the circuit, so far as I can see, that the ADA can't be used to disagree with a medical judgment. Is there anything in this case that's properly within the scope of the ADA? Your Honor, I don't believe there was any medical judgment regarding the Dynavox. The record reflects that the hospital was aware that Ms. Reed relied on the device and that she did use it at times during her stay. You just made the statement yourself. That is, she was uncooperative. She reports and says, I'm suicidal, I need help. The hospital tries to get her to cooperate in her treatment. She's uncooperative and hostile and combative. And the hospital decides, well, maybe we can use access to the Dynavox to induce cooperation, which is essential to the medical treatment. Now, that may be a mistaken judgment, but it is a medical judgment. The question I'm asking is, what does that have to do with the ADA given what seems to be settled law that you can't use the ADA to get a disagreement with a medical judgment? It's the same as the principle that if your client had shown up at a hospital that limits its practice to heart disease, your client couldn't have said, it violates the ADA to turn me away because my condition isn't heart disease and that discriminates against my disability. The hospital can say, we're limited to heart disease. Or the physician can say, this is how I think this condition should be treated without violating the ADA. Isn't that a problem for you? That's my question. Your Honor, I don't accept the premise that the hospital did make a medical judgment here. The hospital hasn't argued that it made a medical judgment to withhold the Dynavox from Ms. Reed. The record just reflects that Mr. Frye said that Ms. Reed had access to the device when her behavior was appropriate. He didn't explain that. That is a statement that access is being used to affect her behavior. We all agree that her behavior is at the core of a potential to commit suicide. That's what this is about. Your Honor, the hospital has never said that appropriate behavior had anything to do with her medical treatment. She needed this device to communicate. No one would think that the hospital could permissibly tape a person. If a person did not have such a disability, I don't think the hospital would argue that it would be medically appropriate to tape that person's mouth shut to induce some form of behavior. And I think affirming the district court's view. Look, I think you're missing my question. The question is not whether something is medically appropriate. That would be the right question in a malpractice action. My question is, does the ADA control medical judgments in figuring out how a hospital deals with one of its patients? Your Honor, I'm sorry if I'm not reading. Is there any case that you can rely on for the proposition that the ADA controls how a hospital treats a patient?  There are lots and lots of cases that hold that it doesn't. But, Your Honor, the hospital has not claimed that it made a medical judgment when it decided to withhold the device from Ms. Reed. And I believe I'm into my rebuttal time. No. Your Honor? Did the hospital offer a rationale in the briefing in the district court for the failure to accommodate claim? No, Your Honor. The hospital's briefing in the district court did not address the failure to accommodate claims. Did the district judge address that claim? I'm sorry? Did the district judge address that claim? He addressed it briefly. He acknowledged at a couple points that Ms. Reed did have a separate Rehabilitation Act claim. No, I mean the failure to accommodate claim. I'm sorry. I misspoke. A failure to accommodate claim. But some of the analysis on the accommodation was that after discussing the seclusion incident, he said that the same principles foreclosed Ms. Reed's other claims, including the DynaVox, and that her behavior was poor. And that's why it was okay. Thank you. Thank you, Your Honor. Thank you, Mr. Cooper. Mr. Foley. Good morning, Your Honors. May it please the Court, my name is Brad Foley. I'm here on behalf of Defendant Apelli, Columbia St. Mary's Hospital. What's presented in this case are three different areas. It's the Title III of the ADA Religious Exemption. It's the Rehabilitation Act. And then lastly is the plaintiff's motion that was filed in the district court to strike the religious exemption defense. I'll address all three. Where in the record will we find what sponsorship entails? What's the legal and factual meaning of one organization sponsoring another? And whatever sponsorship does mean, why shouldn't we assume that it means the same thing for Columbia Health System's sponsorship of Columbia St. Mary's as it does for Extension Health sponsorship of that same company? I have to tell you, I had to make a very detailed chart to try to understand what is going on here. Your Honor, I have a chart right here on the podium, too. Oh, let's trade charts. Okay. I can tell you that my chart is set up. I would say there is evidence that we presented in the district court that establishes that three religious organizations petitioned the Vatican to establish Extension Health Ministries. That was approved by the Vatican in June of 2011. Then that set up Extension Health Alliance, which went to Extension Health, which then to the key issue in this case, I think, on this religious exemption issue is Columbia St. Mary's, Inc. Columbia St. Mary's, Inc. is sponsored by Extension Health and also by Columbia Health System, which is a nonsectarian organization. And what do you mean by sponsored by? Right. What does sponsorship mean? In other words, that there is control by the religious organization going through those different areas I was just talking about. How do we know that sponsorship and control are the same thing? Right. It begs the question just to say it's control. That's the statutory word. How do we know that sponsorship is the same as control? Because in this case, we have the Vatican that set up the Extension Health Ministries that then establishes control, Your Honor, through the various things that we present in the evidence to control the Board of Directors, operating budgets, et cetera. Who appoints the board? What is the actual relationship between Extension Health Ministries and Extension Health Alliance? Does the former own the latter? I mean, what binds them factually and legally? You've argued that Extension Health Alliance was created as a parent organization for the Extension health care system. Created by whom? There's an awful lot of passive voice in your description of these critical relationships. Your Honor, it was created by the Sisters of St. Joseph, of Cardinal Lay, and the Daughters of Charity of St. Vincent de Paul. They petitioned to the Vatican to create that. And then what happens is that the control from Extension Health Ministries then goes through the various corporate organizations going down to Columbia St. Mary's, Inc. Let me try. As I understand it, you have offered evidence in the district court to the effect that a religious institution makes at least some appointments to the directors of Columbia St. Mary's, Inc. Is that right? Correct. Okay. We'll wait and see about whether we'll talk about the waiver problems, the procedural problems, which are huge here in a few minutes. Does anybody else have the power to appoint board members to Columbia St. Mary's, Inc.? Columbia Health System has the ability to, pardon me, the only powers that are reserved to Columbia Health System in this case do not run to approval of the board. So let me rephrase that a little bit. Extension Health, under the bylaws of Columbia St. Mary's, Inc. I've read the bylaws. Is it your view that it's, again, the procedural problems are serious, but your position is that under the various constitutive documents for the board of directors? Correct. Extension Health. Okay. Can we talk about the waiver problem here? I have yet to see the hospital offer any excuse for failing to raise the issue of the religious exemption before its motion for summary judgment. Your Honor, a couple things about that. First of all, we did state in the answer, which I believe was filed in 2015, in September 2015, the answer to the amended complaint, it was stated that there was a failure to state a claim as provided under Rule 8. This is not a failure to state a claim issue. This is an affirmative defense. I would respectfully disagree. It's not stated. Counsel, forget about debating whether it's an affirmative defense. I share my colleague's concern and also was looking for a stated reason why the hospital waited until after discovery had closed. There are two questions. One, did the hospital ever state a reason for this delay? And two, if it didn't state one earlier, do you have one now? The hospital did not state a reason for the delay, number one. Number two is the reason that the religious exemption was not brought up is because, first of all, it was brought up in the deposition of Mr. Fry in February 2016. My goodness, counsel. You know your client's organization, and any hospital that has the word St. Mary's in its name is just screaming for investigation of whether it's religious. So this isn't something that slipped by or that no reasonable lawyer would have noticed. If you listen to what was going on in the last case, the judges were all worried about whether the judge had given reasons. And failure to do something is usually excusable if there's a good reason. But in order for there to be a good reason, there first has to be a reason. And so far there seems to be no reason whatsoever. Isn't that a problem? I would respectfully disagree that it is not a problem. That the plaintiff was put on notice for the questioning of Mr. Fry. Let me tell you my problem with that theory. I've read his deposition testimony. He says he's not really sure what he's talking about in that respect. And if we accept the district court's rationale here, that the questioning of Fry was enough to give the plaintiff fair notice of this down incentives for managing civil litigation, civil discovery. One of the premises of the pleading revolution in Twombly and Iqbal was to try to keep control of out of control discovery costs. And I understand 26B1 on discovery and its limits to have been amended in focus and make more efficient and sensible the discovery process. If an answer like Mr. Fry's in those couple of pages of the deposition testimony is enough to put plaintiff on notice, I've got to do full board discovery on this potential affirmative defense that has never been mentioned in this case when it's supposed to be. Then we're going to give parties, they'll have to spend way too much time, way too much of your client's money, doing discovery on issues that you may not want to raise. It's like I've got to litigate a statute of limitations defense and potential responses to that when it's never been pled. That's crazy. I understand what you're saying, Your Honor. And let me flip it a little bit here by saying this, that it's not necessarily the answers that were put forth by Mr. Fry, but instead the questions that were put forth by Ms. Reed. In that case, the one question in the deposition was, is Ascension a religious organization? Another question was, what type of religious organization? Does Ascension follow the principles of the Catholic Church? In this case, those are- Right, but also the hospital itself was asserting, we've got a policy to comply with the ADA, right? That's true. Fry testified about that. Right. Okay, so given all that, why would you expect, you obviously, I've forgotten who was defending the deposition. I was, Your Honor. But you're starting to raise questions about how this has anything to do with anything in the case, right? I was. Perfectly understandable until you spring the religious exemption defense in the motion for summary judgment. I was raising the question that it seemed far afield from the Rehabilitation Act and the Title III of the ADA claims. But what came out of that was questions being presented by Ms. Reed that were based on terms of art. A religious organization is a term of art from the statute. So because she thought of it, she has to go ahead and do full bore discovery on all potential aspects of that affirmative defense. That's not the way we do civil litigation in federal court, or else it's going to get even more expensive, right? I understand the purpose is to keep the cost of discovery down. But when we're looking at a case like this where the plaintiff was aware, by asking these terms of art in the deposition of Mr. Fry, asking about these questions, the plaintiff was aware at that time. In addition, what happened is that- And the plaintiff also knew you had not pled it as an affirmative defense, correct? It had not been pled as any type of defense. Right. Okay. Go ahead. The most telling part of the district court opinion for me comes on page 21, where the court says that for the two sponsors of the hospital's parent company, quote, while the precise contours of each entity's control may be subject to debate, it is enough to say that the level of non-criterion involvement in Columbian St. Mary's Inc. governance does not displace the primary role that the Catholic Church occupies therein. Look, this is summary judgment, and that sounds an awful lot like the court admitting there are factual disputes, and then taking the issue away from the jury nonetheless. Why is it not a jury question? It's not a jury question given the documents that were presented in the district court that clearly state, including the affidavit of the president and CEO of Columbia Health System, stating that Ascension Health controls and manages the business, property, affairs, and funds of Columbia St. Mary's Inc., which the plaintiff also acknowledged in the briefing. There is nothing clear here. That's why we're all doing these charts. Can I ask you about the Rehabilitation Act problems here? First of all, I'm troubled by the use on the discrimination claim. I'm troubled by the use of an employment discrimination standard to a patient who has gone to the hospital for care. By that you're referring to what the district court in the Brumfield case? In the Brumfield case, yes. We expect police officers to be able to manage their behavior pretty well. Somebody who's come for care of various forms of mental illness and impairments, maybe not so much. Your Honor, I understand what the district was trying to do is draw the analogy that the statute says solely on the basis of Ms. Reed's disability. In this case, the actions that were taken by Columbia St. Mary's, given the concessions by the plaintiff, do not rise to the level of a violation of the Rehabilitation Act solely on the basis of the disability. Rise to the level? How tall is such a violation? I'm just saying that the actions that were taken by Columbia St. Mary's personnel in this case when Ms. Reed I asked your adversaries some questions about how the Rehabilitation Act applies to care received in hospitals. Your brief doesn't discuss that matter at all. It really just assumes that this is the same as an employment case. There is a huge jurisprudence here and in other circuits, including other circuits that have said broadly the ADA just has no application at all to treatment inside hospitals. None. Whatever. You've assumed the opposite in your brief and not cited any of these cases. Is there some reason for that? Your Honor, I thought it was addressed in the district court's decision and we addressed it a lot in our briefing in the district court. We, as a matter of fact, set out on one of the pages in the district court briefing a number, I think it was in the reply brief, where we stated on a number of occasions that I have not read your reply brief in the district court. I thought it was enough to read your brief in the Seventh Circuit. I appreciate that, Your Honor. But the principle remains the same, that as we stated, what's presented here is at best a medical malpractice claim that's subject to the Wisconsin state law as opposed to anything under the Rehabilitation Act. And we laid out the number of occasions, and the district court agreed in its decision of the times that the claim may be more of medical negligence than it may be of any violation of the Rehabilitation Act or the ADA. The problem may be that you focus so entirely on the exemption. The whole merits discussion in your brief is less than three pages long. You haven't developed an argument about what the Rehabilitation Act does in hospitals. Your Honor, our focus was on whether the actions that were done by the CSM personnel and Ms. Reed in the case were focused solely on the basis of her disability. And I thought that we addressed that in the Court of Appeals here. Thank you. Thank you, Counsel. Anything further, Mr. Cooper? You have 20 seconds. Oh, sorry, 18 seconds. This may be a challenge. Very briefly, Your Honor, regardless of the ADA, the Rehabilitation Act clearly applies to hospitals, and we cited several cases at the circuit level that involved communication disabilities, just like this case. I'd also point out that the affidavit to which my friend referred was submitted in reply, so, again, Ms. Reed had no opportunity to probe that. That was on the issue of control. Yes, Your Honor. From the CEO. Okay. Thank you. Thank you, Your Honor. Thank you very much, Counsel. Before calling the third case, we will take a brief recess.